UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------x
:
:
SHARON SULLIVAN                               :
                Plaintiff,    :
:        12 Civ. 2564
        v.                            :
:        **OPINION**
NEW YORK CITY DEPARTMENT OF                   :
INVESTIGATION, NEW YORK CITY                  :
HOUSING AUTHORITY, KELVIN                     :
JEREMIAH (individually and in his             :
official capacity), and BERGIA                :
TELESFORD (individually and in her            :
official capacity),                           :
:
                Defendants.    :
:
-----------------------------------------------x

Sharon Sullivan brings this suit against the New York City Department of Investigation; the New York City Housing Authority; Kelvin Jeremiah, Inspector General of NYCHA; and Bergia Telesford, Deputy Inspector General of NYCHA and Sullivan's immediate supervisor during Sullivan's employment there. Sullivan alleges that she was discriminated against during her time with NYCDOI and NYCHA on account of her race, religion, age, and due to her complaints of discrimination. She seeks relief under 42 U.S.C. § 1983; Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000-e *et seq*; the Age Discrimination in Employment Act, 29 U.S.C. 621 *et seq*; New York State Executive Law, the Human Rights Law § 290 *et seq.*; and New York City Administrative Code § 8-101 *et seq.*

NYCDOI moves to dismiss the complaint in part.  It argues that the court lacks subject matter jurisdiction over Sullivan's state and municipal law claims as she has already pursued them before the New York State Division of Human Rights.  NYCDOI also contends that Sullivan has not adequately pleaded the existence of an official policy or custom to hold NYCDOI, a municipal government entity, liable under § 1983.

Sullivan does not oppose NYCDOI's motion with respect to her state and city law claims.  Accordingly, the motion is granted in this respect.  With respect to Sullivan's § 1983 claim, however, the motion is denied.

## The Complaint

Sullivan is a Roman Catholic, Caucasian woman who was born on April 3, 1952.  At the time of the events that have become the subject of this lawsuit, winter of 2010-11, she was therefore 57 or 58 years old.

That spring, NYCDOI announced that it would be reducing its staff.  To achieve these staff reductions, Sullivan alleges that NYCDOI laid off or

transferred at least fifteen women.  Thirteen of these women were over the age of 50 and all were over the age of 40.  Sullivan says nothing about the number of men let go in this way or the ages of the women retained by NYCDOI.

Sullivan was one of the women transferred to another New York City agency.  Later that year, on September 13, 2010, Sullivan was transferred to NYCHA's Office of the Inspector General where she was to work as a Confidential Investigator.  While OIG is organizationally a part of NYCDOI, its employees are paid by NYCHA.

However, when Sullivan began work at NYCHA-OIG, her start date was "reset," changing from September 1988 to September 13, 2010.  She therefore began work at NYCHA-OIG as an entry-level employee with correspondingly reduced benefits.  Part of Sullivan's accumulated sick leave was allegedly also "bought back" at a reduced rate, costing her several thousand dollars.

After three days of orientation and training, Sullivan began work at NYCHA-OIG, where she met with Telesford, her supervisor.  After informing Sullivan that her responsibilities would include interviewing tenants in public housing, a responsibility Sullivan says was not disclosed to her during her interview for the position, Telesford assigned

Sullivan to the "Audit Squad," where, allegedly, she was the only Roman Catholic and the only Caucasian.

Sullivan describes a number of episodes in her workplace in the ensuing months that convey the impression of a workplace permeated with hostility and disrespect. Some of these events, she alleges, were a result of discrimination by her co-workers and supervisors, and they all contributed to the hostile environment she was allegedly made to endure at NYCHA-OIG.

Throughout her time at NYCHA-OIG, Sullivan alleges that, despite her requests, she was never provided with a Blackberry, business cards, or the software or training necessary to do her job. She alleges that her African-American colleagues, meanwhile, were provided these things.

She also alleges that her African-American co-workers would often wish each other a "blessed day." But, allegedly, none of them extended the same gesture to Sullivan. In fact in September and October of 2010[1] two other employees, including the Assistant Deputy Director, took to referring to Sullivan as an "idol worshipper."

---

[1] Sullivan's complaint describes this and a few other events as occurring in the fall of 2011. However, since Sullivan was terminated in March of 2011, and in keeping with the chronology implied from the structure of Sullivan's complaint, the court surmises that "2011" is actually a typographical error in these cases and that these events actually occurred in the fall of 2010.

On one occasion, Sullivan was not permitted to take time off for a doctor's appointment that she had scheduled a year in advance. In order to keep the appointment Sullivan was made to forgo that day's pay.

That same week, Sullivan was assigned two cases. However, her work on those cases was hindered by the fact that she had not been given training or access to two particular computer systems, and would not be for another three months. Throughout her time at NYCHA-OIG, Sullivan alleges that she was repeatedly told by her supervisors that they did not have time to assist her.

Finally, that same week, Telesford allegedly told Sullivan that she smelled.

A few weeks later, an Assistant Deputy Inspector General allegedly threw a bundle of complaints at Sullivan (literally, one assumes) and told her that she wrote like a six year old.

Around the same time, Telesford instructed Sullivan to conduct some investigative fieldwork. However, she would not permit Sullivan to conduct this fieldwork alone. But when Sullivan was unable to find another employee to accompany her, Telesford did not order another employee to do the job. Sullivan does not say how or whether this impasse was ever resolved.

Also around that time, during the week of October 18, 2010, Sullivan found herself in an elevator with Telesford and Jeremiah (Telesford's superior and a defendant in this case) on their way to an emergency meeting. However, when Sullivan pressed the button for the twenty-ninth floor, where she believed the meeting would be held, Jeremiah began laughing at her and told her that they were actually going to the ground floor. Sullivan alleges that her African-American co-workers were not treated in this manner.

Early the next year, in January 2011, a snow storm struck. As a result, on January 25, Sullivan was ten minutes late for work. She alleges that she was required to forgo her pay for these ten minutes. Sullivan alleges that her African-American colleagues were not penalized under similar circumstances.

The next day, it was announced that non-emergency city offices were closed due to the storm. Accordingly, Sullivan stayed home. But when Sullivan returned to work the next day she saw that an email had been sent at 11:30 the previous day asking employees to come into the office. She had not been able to see this message earlier because she had never been issued a Blackberry. Sullivan was charged seven hours of leave time for her absence.

In February of 2011, after another squad team meeting, Sullivan allegedly complained to Jeremiah that that she was being discriminated against and excluded from meetings due to her race. Jeremiah then gave Sullivan an informal performance review which Sullivan says was very positive.

Not long after this meeting, Sullivan encountered a Deputy Inspector General in an elevator lobby who allegedly remarked that he loved "being in the company of old women." Sullivan says that she also reported this incident to Jeremiah but, she alleges, Jeremiah did nothing.

About one week later, however, Sullivan received a negative performance review for the months between September and December 2010. Sullivan alleges that the evaluation was completed in violation of NYCDOI policies which prohibit a rating's falling more than two grades from a previous evaluation and prohibit the rating of activities that the supervisor was not able to measure for at least ninety days. Sullivan alleges that she was given such a poor evaluation due to her race, age, and religion or in retaliation for her complaints of discrimination.

Later that day Telesford met with Sullivan to discuss the evaluation. Telesford indicated at that, based on her more recent performance, Sullivan's next evaluation would be much improved. Sullivan, for her

part, voiced her belief that the evaluation was designed as an attack on her based on factors other than her job performance. She also pointed out her alleged success in the three cases she had been assigned between September and December. Nonetheless, Telesford demanded that Sullivan sign the evaluation.

Evidently, however, Sullivan refused to sign — she alleges that, the next day, Telesford met with her again and, like before, Telesford demanded that Sullivan sign the evaluation. Sullivan does not say whether she ever actually signed the letter.

Later that day, around noon, Sullivan received word that her daughter had been hospitalized. Sullivan informed her supervisors that she would need to leave to see her daughter, but Telesford responded that she would not be allowed to leave until she had counted the petty cash, as required by the "Tasks and Standards" in Sullivan's job description. To count the petty cash required two employees and Telesford assigned a second employee to count with Sullivan. But because that employee wanted to leave for lunch before beginning to count, Sullivan was not able to finish counting and leave for another four hours. Sullivan alleges that her African-American co-workers were never required to remain at work under similar circumstances.

A few days later, for reasons Sullivan does not explain, Sullivan alleges that she and Jeremiah became involved in a heated exchange. In the course of this exchange Sullivan was terminated, though she does not explain whether her termination was the cause or a result of this confrontation. Jeremiah allegedly screamed at Sullivan and attempted to rip away the identification she was wearing around her neck before he was restrained by NYCHA counsel. After Sullivan handed him her identification, she says that Jeremiah tore it from its clip and threw the clip at Sullivan.

Jeremiah then allegedly demanded that Sullivan sign a document. Sullivan says that she refused because she did not have her glasses and, therefore, could not read it. Jeremiah then allegedly became incensed and demanded that Sullivan give him her shield and that she leave the premises immediately. He then lifted her out of her chair by the arm and took her into the hallway to get her shield, which was at Sullivan's desk. Sullivan then alleges that she handed her shield over to Jeremiah and began to collect her belongings from her desk, but she was escorted from the building before she could finish.

**Discussion**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must plead sufficient facts to state a claim to relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Ashcroft v. Iqbal, 556 U.S. 662, (2009).  In deciding such a motion, a court must accept as true the facts alleged in the complaint, but it should not assume the truth of its legal conclusions.  Iqbal, 556 U.S. at 678-79.  A court must also draw all reasonable inferences in the plaintiff's favor, and it may consider documents attached to the complaint, incorporated by reference into the complaint, or known to and relied on by the plaintiff in bringing the suit.  ATSI Commc'ns, Inc. v. Shaar Fund. Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

It is well established that a municipality may not be sued under 28 U.S.C. § 1983 for acts of its employees unless a plaintiff can show that these actions were caused by an official policy or custom of the municipality.  Monell v. Dep't of Soc. Services of City of New York, 436 U.S. 658 (1978).  And, in keeping with the pleading requirements imposed by Twombly and Iqbal, a plaintiff must allege specific facts to plausibly suggest that a policy was in effect, not just bald allegations that

such a policy existed. See Davis v. City of New York, 07 Civ. 1395, 2008 WL 2511734 (S.D.N.Y. June 19, 2008).

Certainly Sullivan's complaint contains no plausible factual allegation that Telesford or any other city official has formally promulgated an official policy calling for discrimination against Caucasians, Catholics, or women of a certain age. It does contain a recitation that a "custom or practice" existed at NYCHA-OIG, but this is precisely the sort of conclusory allegation that a court, applying Iqbal, may not assume to be true.

Thus, if the court is to conclude that Sullivan has adequately alleged the existence of such an official practice, it must look to Sullivan's specific, concrete factual allegations.

Here, plaintiff's experiences at the hands of numerous city officials and the conspicuous inaction of Jeremiah and Telesford are sufficient to plead that NYCHA-OIG had adopted a tacit policy acceptance of discriminatory behavior by its employees. It is true that, as the Supreme Court noted, a pattern of similar violations is "ordinarily necessary" to demonstrate that a municipality may be rendered liable by their deliberate indifference to ongoing constitutional violations. Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011). However, strict application of

that test in this case would be inappropriate and unfair.  At NYCHA-OIG, Sullivan was the only member of the groups with which she identifies — older women, Caucasians, Catholics — and which allegedly formed the basis for her co-workers' hostility.  Under these circumstances, unthinking adherence to the "pattern of similar violations" test would result in the conceptual impossibility of any claim for deliberate indifference — no matter the circumstances — since the discriminated-against group had only a single member.

A better approach begins with recalling that the existence of a pattern of similar violations is merely the *ordinary* means of diagnosing whether "a municipal actor disregarded a known or obvious consequence of his action."  But this case exemplifies an alternate scenario.  Here, instead of a pattern of violations affecting many employees, the pattern is established by the recurring violations with respect to this single employee over time and by the actual knowledge and actual inaction of high-level officials.

During Sullivan's almost six-months at NYCHA-OIG she alleges that she was repeatedly insulted and sabotaged due to her ethnicity, religion, and age.  As Sullivan describes them, these were not isolated incidents but a constant, oppressive pattern of disrespect that totally undermined

her ability to function as an employee.  What's more, Sullivan alleges that she brought this discrimination to the attention of her supervisors, high-level city officials, who did nothing.

Under these circumstances, Sullivan has adequately alleged that municipal actors (here the NYCHA Inspector General and Deputy Inspector General) knew that she was enduring unconstitutional discrimination.  They knew because she told them.  In failing to act, these officials disregarded the obvious fact that, absent their intervention, this striking pattern of discrimination would only continue.  Due to this failure to act, Sullivan has adequately alleged that this conduct became "an accepted custom or practice of the employer." Gierlinger v. New York State Police, 15 F.3d 32, 34 (2d Cir. 1994).

Thus, Sullivan has adequately pleaded the basis for a § 1983 claim on the basis that NYCHA-OIG adopted a tacit policy of inaction towards violations of her civil rights.

## Conclusion

For the reasons stated above, NYCDOI's motion to dismiss Sullivan's state and city law claims is granted.  As it relates to Sullivan's § 1983 claim against NYCDOI, however, the motion is denied.

So ordered.

Dated: New York, New York
February 21, 2013

Thomas P. Griesa
U.S. District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Feb 21, 2013