UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-17-16

SHARON SULLIVAN,

                Plaintiff,

       v.

NYC DEPARTMENT OF
INVESTIGATION *et al.*,

                Defendants.

12-cv-2564

**OPINION**

Plaintiff Sharon Sullivan brings claims of employment discrimination and retaliation against her former employers, defendant New York City Department of Investigation ("DOI") and defendant New York City Housing Authority ("NYCHA"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). Plaintiff alleges that these former employers discriminated against her on the basis of her race, religion, and age and retaliated against her for making complaints of discrimination. Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the motions are granted.

1

## Facts

Plaintiff is a Roman Catholic, Caucasian woman who was born in 1952. Compl. ¶ 10.   In April 2010, at the age of 57, plaintiff was working as a Confidential Investigator in DOI's Audit Unit.   Pl.'s Local Rule 56.1 Counterstatement to DOI's Statement of Material Facts ("Counter-DOI") ¶¶ 8–9, ECF No. 81.   That month, DOI conducted layoffs, but did not fire plaintiff. *Id.* ¶ 9.   However, in June 2010, DOI encouraged plaintiff to find another position in advance of possible additional layoffs.   *Id.* ¶ 10.   According to plaintiff, DOI laid off or transferred at least fifteen women, thirteen of whom were over the age of 50 and all of whom were over the age of 40.   Compl. ¶ 12.

In August 2010, plaintiff appeared for an interview at NYCHA in the Office of the Inspector General ("NYCHA-OIG").   Pl.'s Local Rule 56.1 Counterstatement to NYCHA's Statement of Material Facts ("Counter-NYCHA") ¶ 40, ECF No. 80.   NYCHA-OIG is supervised by DOI, but its employees are paid by NYCHA.   *Id.*   ¶¶ 6–7.   Kelvin Jeremiah, an African-American male, was Inspector General at NYCHA-OIG.   *Id.*   ¶ 8.   Jeremiah had gotten word that DOI was undertaking staff reductions and had agreed to consider DOI employees, including plaintiff, for vacancies within the NYCHA-OIG.   Counter-DOI ¶¶ 12–13.

As a result of the interview, plaintiff was offered a position at NYCHA-OIG as a Confidential Investigator in the Audit Squad. *Id.* ¶¶ 21–22.   Jeremiah told

plaintiff that the position was subject to a six-month probationary period.  *Id.* ¶ 23.  In addition, plaintiff's accumulated leave was reduced.  Compl. ¶ 17.

On September 13, 2010, plaintiff began her work at NYCHA-OIG. Counter-NYCHA ¶ 49.  From September 13, 2010 through September 15, 2010, plaintiff attended orientation and training on NYCHA's Human Resources policies and procedures.  *Id.* ¶ 50.  On September 16, 2010, plaintiff met with her supervisor, Deputy Inspector General Bergia Telesford.  *Id.* ¶ 52.  Telesford is a Roman Catholic, African-American woman who was born in 1951.  *Id.* ¶ 9; Telesford Decl. ¶ 86, ECF No. 65.   Telesford informed plaintiff that her responsibilities would include field work, a fact that was not disclosed to plaintiff during her interview for the position.  Compl. ¶ 19.

Another aspect of plaintiff's job involved Complaint Data Intake ("CDI") duty once or twice per month.  Counter-NYCHA ¶ 65.  CDI required access to certain databases, and plaintiff says she was not provided with proper access to those databases until December 2010.  Counter-NYCHA ¶¶ 66–90.  In addition, plaintiff claims she was never properly trained in CDI by her immediate supervisor, Natalie Wright.  Andrei Decl. Ex. K, Sullivan Dep. 182–85, ECF No. 73.

Upon reviewing plaintiff's initial work, Wright threw the work back at plaintiff and told her that she wrote like a six year old.[1]  Compl. ¶ 25; Sullivan Dep. 192.  Plaintiff did not immediately report the incident, but once she did

---

[1] Wright denies this incident.

tell Jeremiah and Telesford, Telesford spoke with Wright, advising her, "we have to foster professionalism and respect."   Counter-DOI ¶¶ 106–07; Andrei Decl. Ex. M, Telesford Dep. 109–10, ECF No. 73.

Plaintiff alleges that she was treated differently from her non-Catholic, African-American colleagues.   Some of this treatment was overt.   For example, one colleague, Dorothy Vann, referred to plaintiff as an "idol worshipper." Sullivan Dep. 227–28.   Plaintiff's non-Catholic, African-American co-workers would greet each other with the phrase "Have a blessed day."   Sullivan Dep. 617.   None of them extended the same gesture to plaintiff.   *Id.*

There were also more subtle differences in treatment that plaintiff relates to her religion or race.   Plaintiff was never provided with a Blackberry phone or business cards.   Sullivan Dep. 415.   At one point, Telesford told plaintiff that she smelled.   Sullivan Dep. 74.

Plaintiff also endured comments relating to her age.   Deputy Inspector General Osarentin Omoigui told plaintiff that he loved being in the company of old women.   Sullivan Dep. 259.   Office Manager Deirdre Coker-Major told plaintiff "I am going to eat whatever you eat, so I wind up looking like you when I get to your age."   Sullivan Dep. 285.   Vann pinched plaintiff on the midriff and told her, "you see, [your] age is showing."   Sullivan Dep. 238.

On January 25, 2011, plaintiff arrived ten minutes late for work due to a snow storm.   Sullivan Dep. 442.   According to plaintiff, Telesford told her to dock herself pay for her tardiness, but did not say a similar thing to the

African-American workers. Sullivan Dep. 442–43. Ultimately, plaintiff was not pay-docked for any part of that day. Counter-NYCHA ¶ 119. The following day, plaintiff stayed home from work because the Mayor announced that only emergency crews were to report to work due to the storm. *Id.* ¶ 120. Initially, plaintiff, as well as the other employees who stayed home, were pay-docked for the day. Jeremiah Decl. ¶ 34, ECF No. 64. Ultimately, however, plaintiff was credited back the day's pay. Counter-NYCHA ¶¶ 121–24.

In February 2011, Plaintiff received a performance evaluation for her work in 2010. Counter-DOI ¶ 37. The review was conducted by Telesford and overseen by Jeremiah. Andrei Decl. Ex. L, Jeremiah Dep. 121, ECF No. 73. The evaluation was based on a seven-grade scale: Outstanding (exceeds all standards); Very Good (exceeds most of the standards); Good (meets all standards); Conditional (one or more of the attainable standards by which the task is measured was not achieved, but the lack of achievement was either the result of conditions outside the employee's control or the appraiser expects that the standard will be achieved if the employee participates in plans to develop his/her knowledge, skills, or abilities); Marginal (meets few of the standards); Unsatisfactory (meets none of the standards); Not Ratable (the employee was not actually assigned the task listed or the employee has performed the listed task for less than 60 days and thus a judgment with respect to performance cannot be made). Rowntree Decl. Ex. H, ECF. No. 61. Plaintiff was given seven ratings of Good, three ratings of Conditional, and six ratings of Not Ratable.

Plaintiff was given an overall rating of Conditional. *Id.* Telesford wrote that plaintiff required frequent guidance in her new role and that she spent too much time on non-work matters. *Id.*

On February 28, upon receiving her evaluation, plaintiff approached Telesford and asked "how the fuck" Telesford could have given her such an evaluation. Counter-NYCHA ¶ 171. Plaintiff raised her voice and continued to direct profanities toward Telesford. *Id.* ¶ 172.

The next day, on March 1, plaintiff was assigned to conduct an audit of the NYCHA-OIG's petty cash box. *Id.* ¶ 179. In response to the assignment, plaintiff told Telesford, "You want me to do your petty cash count. I'm not smart enough to do your petty cash count." I see it . . . what is being done - - it's being set up for failure. You evaluated me and you don't think I'm smart enough to do the job." *Id.* ¶ 180.

Around noon that day, plaintiff received a call from her daughter, who told plaintiff that she was at the hospital and was going to have emergency surgery that afternoon. Wojciechowski Decl. ¶¶ 2–3, ECF No. 79. At 12:53 PM, Telesford wrote an email to plaintiff directing her to audit the petty cash box "before close of business day today." Telesford Decl. Ex. N. Around 1:30 PM, plaintiff informed Telesford that her daughter had to have emergency surgery. Telesford Decl. Ex. O. According to Telesford, Telesford advised plaintiff verbally that she could leave to attend to her daughter. *Id.* Plaintiff then emailed Telesford stating that "I will stay to do your petty cash [count],

6

however, please be advised that I verbally shared with you that my daughter is being prepared for emergency surgery." Telesford Decl. Ex. N.  Upon her return from lunch, Telesford read plaintiff's email and responded at 2:50 PM. Telesford wrote: "After being directed to do the petty cash count today, you mentioned that your daughter is having emergency surgery today, at which time you were told that you can leave.  Please know that you have approval to use your personal time to take off the rest of today, and that the petty cash count can be done on another day." *Id.*  Thereafter, Telesford went to plaintiff in person and instructed her to leave, but plaintiff refused.  Counter-NYCHA ¶ 186.  Plaintiff states she stayed for fear of losing her job.  Sullivan Dep. 550.

That afternoon, Jeremiah consulted with Kevin Smith, Counsel to the Inspector General, about plaintiff's response to her evaluation.  Counter-NYCHA ¶ 189.  Jeremiah decided to terminate plaintiff based on her insubordination and reached out to DOI to discuss his decision.  *Id.*; Jeremiah Decl. ¶ 45.

The following day, on March 2, plaintiff replied to Telesford's email sent at 2:50 PM the previous day, copying Jeremiah on the email.  Plaintiff wrote:

> In fact, you repeated that I was expected to stay to do the petty cash . . . This email is a sorry excuse and attempt to cover your continued discrimination against me.  It was approximately noon when I told you I had a family emergency.  I left when the petty cash count was done at 3:55pm.  This was a stroke of abuse of power on your part and substantiates your inability to make supervisory decisions.

Telesford Decl. Ex. N.

7

On March 3, Jeremiah submitted a memorandum to NYCHA Human Resources requesting plaintiff's termination. Counter-NYCHA ¶ 190.

On March 4, Jeremiah terminated plaintiff. *Id.* ¶ 191. According to plaintiff, Jeremiah took her under the arm, dragged her through a corridor into his office, ripped off her ID from around her neck, threw it back at her, and threw her back into the hallway. Sullivan Dep. 575–76. Jeremiah disputes plaintiff's account. Jeremiah Decl. ¶¶ 49–50.

Prior to filing suit in this court, on July 25, 2011, Sullivan filed complaints with the New York State Division of Human Rights ("NYSDHR") and the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that defendants discriminated against her based on age, creed, race, and sex in violation of the New York Human Rights Law, based on the same facts now before this court. Andrei Decl. Ex. J, ECF No. 73. Her complaint also alleged retaliation based on her complaints of discrimination. *Id.* In response to this complaint, defendants filed a position statement, denying Sullivan's allegations and requesting dismissal of the complaint. Counter-NYCHA ¶ 213.

On January 20, 2012, after investigating Sullivan's allegations, the NYSDHR issued an order, finding that there was no probable cause to believe that defendants engaged in unlawful discriminatory practices. Andrei Decl. Ex. J, ECF No. 73. Specifically, the NYSDHR stated that:

> The allegations are not sufficiently supported in order to justify a finding for the complainant. Our investigation does not substantiate a causal nexus between the actions complained of

8

and the protected status of complainant as a member of any of the classes as cited in this complaint.

On February 22, 2012, the EEOC adopted the findings of the NYSDHR and dismissed Sullivan's federal discrimination charge.  *Id.*

On April 4, 2012, Sullivan filed the present action, seeking relief under 42 U.S.C. § 1983, Title VII, the ADEA, the New York State Human Rights Law, and the New York City Human Rights Law.

On March 26, 2014, the court dismissed plaintiff's claims under § 1983. Plaintiff voluntarily withdrew her claims under Title VII and the ADEA against the individual defendants.  Plaintiff also voluntarily withdrew her claims under the State and City Human Rights Laws against all defendants.  Thus, what remains are plaintiff's claims under Title VII and the ADEA against DOI and NYCHA.  Defendants have filed motions for summary judgement as to those remaining claims.

## Discussion

### I.   Summary Judgment Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.,* 521 F.3d 130, 132 (2d Cir. 2008); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  To

9

survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see Wright v. Goord,* 554 F.3d 255, 266 (2d Cir. 2009). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian,* 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)).

## II.    Employment Discrimination

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The ADEA makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623. Employment discrimination claims asserted under Title VII and the ADEA are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See, e.g., Abrams v. Dep't of Pub.*

*Safety*, 764 F.3d 244, 251 (2d Cir. 2014); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010).

Under the *McDonnell Douglas* framework, the initial burden is on the plaintiff to establish a *prima facie* case of discrimination.  *Abrams*, 764 F.3d at 251.  Once the plaintiff has established a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.  *Id.*  If the employer is able to satisfy that burden, the final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination.  *Id.*

### a.  Plaintiff's *Prima Facie* Case

To establish a *prima facie* showing of discrimination, the plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015).

Defendants do not dispute that plaintiff is a member of a protected class or that she was qualified for the position she held.

With regard to prong three, it is worth noting at the outset that plaintiff may point only to adverse actions occurring during her time with NYCHA to make her *prima facie* showing.  Title VII and the ADEA require a plaintiff to file a charge of discrimination with the EEOC within 300 days of the

11

discriminatory act, where a charge was initially filed with a state employment agency.  42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1)(B); *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 328 (2d Cir. 1999) (ADEA); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996) (Title VII).  Thus, any Title VII or ADEA claims that accrued more than 300 days prior to the filing of the charge of discrimination with the EEOC are time-barred.

Here, plaintiff filed her administrative complaint with the EEOC on July 25, 2011.  Three hundred days prior to July 25, 2011 is September 28, 2010.

Plaintiff's claims related to her time at DOI are thus time-barred, as she had left DOI prior to September 28, 2010.  While plaintiff acknowledges that her separation from DOI occurred before September 28, 2010, she cites the continuing violation exception, which allows for acts that would otherwise be time-barred to be considered "where there is proof of specific ongoing discriminatory polices or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice."  *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994).

The continuing violation exception is of no help to plaintiff.  "[D]iscrete incidents of discrimination that are not the result of a discriminatory policy or practice will not ordinarily amount to a continuing violation."  *Van Zant*, 80 F.3d at 713.  Here, DOI's decision to encourage plaintiff to look for another position is completely unrelated to the events that plaintiff complains of that

12

occurred during her time with NYCHA. Any adverse actions involved different supervisory individuals making the decisions. Thus, plaintiff's claims related to her time at DOI are time-barred, and the court must look only to her time at NYCHA to determine whether she suffered an adverse employment action.

For an employment action to be adverse, it must result in a materially adverse change in the terms and conditions of employment that is more disruptive than a mere inconvenience. *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). "Everyday workplace grievances, disappointments, and setbacks do not constitute adverse employment actions." *Chukwuka v. City of New York*, 795 F. Supp. 2d 256, 260 (S.D.N.Y. 2011) *aff'd*, 513 F. App'x 34 (2d Cir. 2013).

Plaintiff argues that the reprimand she received from Wright—when Wright threw work back at plaintiff and told plaintiff that she wrote like a six year old—constitutes an adverse employment action. However, this conduct does not rise to the level of an adverse employment action. In *Mathirampuzha v. Potter*, a supervisor "grabbed the plaintiff's arm, punched him in the shoulder and the chest, spit in his face, and poked him in the eye." 548 F.3d 70, 73 (2d Cir. 2008). The Second Circuit held that this "unprofessional and boorish" treatment did not amount to an adverse employment action because it did not affect the plaintiff's position, pay, responsibilities, or ability to do his job. *Id.* at 78–79. If that physical abuse did not amount to an adverse employment action, then surely Wright's verbal reprimand does not either.

13

Plaintiff also highlights her performance evaluation that she received in February 2011 and argues that it constitutes an adverse employment action. However, "courts in this Circuit have held that it is well-settled that negative evaluations alone, without any accompanying adverse consequences, such as a demotion, diminution of wages, or other tangible loss, do not constitute adverse employment actions." *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 499 (S.D.N.Y. 2010) (internal quotation marks omitted). Here, the employment evaluation was not accompanied by any tangible adverse consequences. Thus, it does not qualify as an adverse employment action.

To be sure, plaintiff did experience one adverse employment action at her time with NYCHA: her termination. To complete her *prima facie* showing, then, plaintiff must demonstrate that her termination occurred under circumstances giving rise to an inference of discrimination.

In her attempt to establish this fourth prong of a *prima facie* case, plaintiff relies upon her allegation that she was treated differently than her non-Catholic, non-Caucasian, younger colleagues. The burden on plaintiff in establishing a *prima facie* case is rather minimal, and a showing of disparate treatment as compared to similarly situated employees is a common way to create an inference of discrimination. *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001). The complaint includes allegations that plaintiff did not receive timely access to certain databases, proper training, or business cards or a Blackberry phone. Plaintiff also asserts that she suffered numerous

14

comments related to her protected statuses that her colleagues did not have to endure.  The court need not decide whether these allegations, when taken together, are enough to satisfy plaintiff's minimal *prima facie* burden, because, as described below, plaintiff fails to satisfy her ultimate burden of showing that her termination was based on discrimination.

### b.  Defendants' Legitimate, Non-Discriminatory Reason for Termination

Assuming, *arguendo*, that plaintiff is able to establish a *prima facie* case of discrimination, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its adverse employment action.  Here, defendant NYCHA has indeed articulated such a reason: plaintiff's belligerent and insubordinate response to her performance evaluation.

Upon receiving her evaluation, plaintiff approached Telesford and asked "how the fuck" Telesford could have given her such an evaluation.  Plaintiff raised her voice and continued to direct profanities toward Telesford.  The next day, plaintiff openly disputed her assignment to audit OIG's petty cash box, claiming she was not competent to complete it in light of her performance review.  Plaintiff's inappropriate response to her performance evaluation gave NYCHA sufficient cause to terminate her.  Defendants have thus satisfied their burden at this stage of the analysis.

### c.  Plaintiff Cannot Prove Pretext

Given defendant's legitimate, non-discriminatory reason for its adverse employment action, the burden shifts back to plaintiff to establish that defendant's proffered reason was pretext for unlawful discrimination.  To demonstrate pretext, a plaintiff must establish "circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination." *Kirkland v. Cablevision Sys.,* 760 F.3d 223, 225 (2d Cir. 2014) (internal quotation marks omitted).  With the ADEA claim, plaintiff must offer evidence that age discrimination was a but-for cause of the challenged action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).  Here, plaintiff fails to satisfy her burden.

Even when considering all of plaintiff's allegations, the court finds that no rational jury could infer that NYCHA's decision to terminate plaintiff was based on discrimination.  First, there can be little doubt that plaintiff reacted very poorly to her performance review.  Second, plaintiff makes no claim that Telesford or Jeremiah made any statements about plaintiff's age, race, gender, or religion.  Third, plaintiff was not the oldest employee or the only Caucasian, female, or Catholic employee in the Audit Squad of the OIG.

In her attempt to prove pretext, plaintiff points to shifting explanations as to why she was fired, the timing of her termination, and a failure to collect evidence and deviation from policy.  Plaintiff's arguments are without merit.

16

A plaintiff can indeed show pretext by demonstrating shifting reasons or inconsistencies in the defendant's proffered reasons for its action. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). Here, though, Jeremiah's explanations as to why plaintiff was fired were not inconsistent. Jeremiah cited both plaintiff's insubordination and her subpar performance as reasons for her termination. But as Jeremiah explained in his deposition, her "subpar" performance included personal behavior that did not lend itself to having a constructive relationship with her supervisors. Jeremiah Dep. 142. Jeremiah's explanations for why plaintiff was let go do nothing to convince the court that those reasons were pretextual.

Similarly, the timing of plaintiff's termination does not prove pretext. Plaintiff makes two points on timing. First, plaintiff argues that the record indicates that plaintiff experienced no problems before coming to NYCHA. Plaintiff's history in another job is simply inconsequential and does nothing to rebut defendant's reasons for terminating plaintiff. Second, plaintiff highlights that she was fired two days after reporting discrimination. However, Jeremiah decided to terminate plaintiff the day *before* plaintiff sent her email alleging discrimination.

Further, though plaintiff used the word "discrimination" in an email, Jeremiah and Telesford had no reason to know that plaintiff was complaining of discrimination based on a protected status. *See Early v. Wyeth Pharm., Inc.*, 603 F. Supp. 2d 556, 576 (S.D.N.Y. 2009) ("The onus is on the speaker to

17

clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally"). Here, when examining plaintiff's email as a whole, the word "discrimination" reads more as a synonym of "unfair treatment generally" than as a bias against a protected status. On March 2, two days after plaintiff received her performance report, and the day after plaintiff challenged her audit assignment, plaintiff wrote to Telesford:

> In fact, you repeated that I was expected to stay to do the petty cash . . . This email is a sorry excuse and attempt to cover your continued discrimination against me. It was approximately noon when I told you I had a family emergency. I left when the petty cash count was done at 3:55pm. This was a stroke of abuse of power on your part and substantiates your inability to make supervisory decisions.

Importantly, plaintiff makes no claim that Telesford ever made any statements about plaintiff's age, race, gender, or religion. Thus, the complaint of "discrimination" cannot be read as a complaint of unfair treatment based on protected status. Plaintiff's arguments on timing, then, are unconvincing.

Plaintiff's third argument related to pretext focuses on Jeremiah and Telesford and their failure to collect evidence and their deviation from policy. In her brief, plaintiff points to a few instances when she says she went to Jeremiah and Telesford with complaints. Namely, plaintiff says she reported to Jeremiah and/or Telesford the time when Wright threw work back at plaintiff and told plaintiff that she wrote like a six year old as well as the time Telesford told plaintiff that she smelled. Firstly, Teleford followed up with Wright,

18

verbally counselling her that "we have to foster professionalism and respect." More importantly, Jeremiah and Telesford had no reason to know that these complaints had anything to do with discrimination based on a protected status. Thus, despite plaintiff's claim to the contrary, Jeremiah and Telesford were under no duty to report the incidents under NYCHA's discrimination policy. *See* Celeste Decl., Ex. Z.

In sum, plaintiff has adduced no evidence from which a reasonable factfinder could conclude that the defendant's proffered reason for terminating plaintiff was a pretext to disguise a discriminatory motive. Defendants are entitled to summary judgment as to plaintiff's claims for employment discrimination.

### III.   Hostile Work Environment

To prove a hostile work environment claim, a plaintiff must show that (1) her workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to create an environment that a reasonable person would find hostile or abusive; (2) she subjectively perceived the environment as hostile or abusive; and (3) the employer created such an environment because of her protected characteristic. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).

Here, plaintiff is unable to show that a reasonable person would find her workplace hostile or abusive. Of plaintiff's complaints regarding her supervisors, most involved minor setbacks typical in the workplace. For

example, while plaintiff did not receive a Blackberry phone, this was due to the fact that former DOI employees who subsequently joined NYCHA-OIG typically arrived with their DOI-issued devices.    Capek Decl. ¶ 3, ECF No. 68. Additionally, while there is a dispute in the record as to whether plaintiff did or did not receive proper training in CDI duty, regardless, CDI represented a very minor part of plaintiff's job responsibilities.    And plaintiff testified that if a supervisor was unavailable to assist her at a particular moment, she would not follow up.  Sullivan Dep. 229–33.

Plaintiff's complaints about Telesford are similarly inconsequential. First, Telesford clarified that when she said that plaintiff smelled, she was referring to the smell of cigarette smoke.    Telesford Decl. ¶ 43.    Second, although Telesford initially told plaintiff to pay-dock herself for arriving ten minutes late, plaintiff was not actually docked any pay.   Third, during the incident when plaintiff's daughter was in the hospital, it undisputed that at some point in time Telesford told plaintiff that she could leave but that plaintiff refused.  That is hardly indicative of a hostile or abusive work environment.

The alleged incident involving Wright throwing work back at plaintiff and telling her that she wrote like a six-year old is more concerning.  But while the incident was undoubtedly unpleasant for plaintiff, it does not rise to the level of creating a hostile or abusive environment.   Wright's aggressive reprimand was an isolated one, and Wright was verbally counseled by her superior Telesford after the incident.  Importantly, there is no indication that Wright's behavior

toward plaintiff was due to animus of plaintiff's protected status.   Thus, the incident with Wright is not enough to maintain plaintiff's hostile work environment claim.

The closest plaintiff comes to proving an objectively hostile or abusive work environment is through her allegations concerning the age- and religion-based comments made by her co-workers.   But even these incidents, when taken together, are not enough for plaintiff.

Some of these comments do not contribute to a claim at all.   For example, some co-workers wishing each other a "blessed day" certainly does not qualify as discriminatory intimidation, ridicule, or insult, even if they never extended the same gesture to plaintiff.

More serious comments include one colleague's reference to plaintiff as an "idol worshipper" and statement that plaintiff's "age is showing," and another colleague's statement that he loved being in the company of old women.   However, the Supreme Court has warned that Title VII is not meant to be a "general civility code" for the workplace.   *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).   To determine whether an environment is hostile or abusive, courts look at a variety of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."   *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).   Here plaintiff's allegations include stray remarks that

may be tasteless or impolite, but are not physically threatening.   The court finds that the remarks cited by plaintiff are not sufficiently severe and pervasive as to create a hostile or abusive work environment.   *See Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004) ("Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment"); *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 713 (2d Cir. 1998) (no hostile work environment where one supervisor made racist remarks, including one directed at plaintiff); *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989) ("incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive").   As such, defendants are entitled to summary judgment as to plaintiff's claims of a hostile work environment.

## IV.   Retaliation

Title VII makes it unlawful for an employer to discriminate against an employee because that employee has opposed any practice made an unlawful employment practice by Title VII, or because that employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.   42 U.S.C. § 2000e–3(a).   The ADEA has a nearly identical anti-retaliation provision.   29 U.S.C. § 623(d).   Like discrimination claims, retaliation claims are analyzed under the burden-shifting approach of *McDonnell Douglas*.   *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).

22

To establish a *prima facie* case of retaliation, the plaintiff must show (1) she engaged in protected activity; (2) her employer had knowledge of the protected activity; (3) she suffered an adverse employment action; and (4) there exists a causal connection between the protected activity and the adverse employment action. *Id.* at 844.

Unfortunately for plaintiff, she cannot show that she engaged in protected activity. For purposes of determining whether an activity is protected, Title VII's anti-retaliation provision includes both an opposition clause and a participation clause. *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 48 (2d Cir. 2012). The opposition clause makes it unlawful for an employer to retaliate against an individual because she "opposed any practice" made unlawful by Title VII, while the participation clause makes it unlawful to retaliate against an individual because she "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. *Littlejohn v. City of New York*, 795 F.3d 297, 316 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e–3(a)). The opposition clause protects informal protests, including making complaints to management. *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). However, in order to engage in protected activity, a plaintiff must link her complaints to unlawful discrimination or her protected status. *Penberg v. HealthBridge Mgmt.*, 823 F. Supp. 2d 166, 191 (E.D.N.Y. 2011).

Here, as explained above, although plaintiff claims to have made certain complaints to her supervisors, it is not clear that she ever characterized those complaints as opposing unlawful discrimination based on her protected status. Further, simply using the word "discrimination"—as plaintiff did in her March 2 email—is not enough to link the complaint to unfair treatment based on a protected status.[2]

Even if plaintiff did engage in protected activity, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). Based on plaintiff's vague complaints, NYCHA could not have known that plaintiff was opposing conduct prohibited by Title VII.

Finally, even if plaintiff could make a *prima facie* showing of retaliation, defendant has proffered a legitimate, non-retaliatory reason for terminating plaintiff, namely, her insubordination.  And, based on the evidence in the record, a reasonable jury could not find that this proffered reason was pretextual and that retaliation was a but-for cause of plaintiff's termination. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)

---

[2] It is also worth noting again that Jeremiah made the decision to terminate plaintiff the day before she sent the email that used the word "discrimination."

(requiring but-for causation for retaliation claims under Title VII).   Therefore, defendants are entitled to summary judgment on plaintiff's retaliation claim.

## Conclusion

Defendants' motions for summary judgment are granted.   This action is dismissed in its entirety.

So ordered.

Dated:  New York, New York
       February 17, 2016

_____
Thomas P. Griesa
United States District Judge